STAR TRIBUNE, et al., Appellants,

Metropolitan Sports Facilities Commission, Respondent,

v.

MINNESOTA TWINS PARTNERSHIP, a Minnesota General Partnership, d/b/a Minnesota Twins Baseball Club and the Minnesota Twins, Respondent,

Major League Baseball, an unincorporated association doing business in Minnesota and headquartered in New York, Respondent.

No. C7–02–1204.

Court of Appeals of Minnesota.

April 15, 2003.

John P. Borger, Eric E. Jorstad, Patricia R. Stembridge, Faegre & Benson, L.L.P. and Christine Jo Caspers, Star Tribune, Minneapolis, for appellants.

Corey J. Ayling, Andrew J. Shea, Kathleen M. Brennan, McGrann Shea Anderson Carnival, Straughn & Lamb, Minneapolis, for respondent Metropolitan Sports Facilities Commission.

Roger J. Magnuson, Peter W. Carter, Andrew Hanson, Dorsey & Whitney, L.L.P., Minneapolis, for respondent Minnesota Twins Partnership.

Joseph W. Anthony, Mark D. Wisser, Anthony Ostlund & Baer, P.A., Minneapolis, for respondent Major League Baseball.

Considered and decided by PETERSON, Presiding Judge, HARTEN, Judge, and HALBROOKS, Judge.

## OPINION

HALBROOKS, Judge.

Appellants challenge the district court's order denying their motions to intervene, to modify the court's protective order, and to have access to unfiled discovery and sealed pleadings. Appellants, all members of print and electronic media, argue that the district court (1) abused its discretion in entering the protective order and (2) erred by refusing to provide the media with access to the unfiled discovery and sealed pleadings and by denying the media's motion to intervene. Because we conclude that the district court acted within its discretion and correctly applied the law, we affirm.

## FACTS

On July 31, 1998, the Metropolitan Sports Facilities Commission[1] and the Minnesota Twins entered into an agreement, known as the 1998 Baseball Use Agreement. The agreement governs the Twins' use of the Hubert H. Humphrey Metrodome to play their home baseball games. At the conclusion of the 2001 baseball season, the Twins exercised their option under the 1998 agreement to play the 2002 baseball season in the Metrodome.

In the fall of 2001, local and national media reported that Major League Baseball (MLB) was considering eliminating two franchises: the Montreal Expos and the Twins.[2] Based on these reports, the commission sued the Twins and MLB, alleging breach of contract and other tort claims.

---

1. The Metropolitan Sports Facilities Commission owns and operates the Hubert H. Humphrey Metrodome.

2. On February 5, 2002, Major League Baseball (MLB) announced that no baseball teams would be contracted during the 2002 season. Subsequently, MLB and the MLB players' union agreed that no baseball teams would be contracted before the conclusion of the 2006 baseball season.

The district court granted the commission's motion for a temporary restraining order preventing the sale or elimination of the Twins pending a hearing on the commission's motion for a preliminary injunction. Shortly thereafter, the district court granted the commission's motion for a preliminary injunction, requiring the Twins to stay in business and play their entire 2002 schedule. The Twins and MLB appealed the district court's order, and we affirmed. *Metro. Sports Facilities Com'n v. Minn. Twins P'ship,* 638 N.W.2d 214 (Minn.App. 2002), *review denied* (Minn. Feb. 4, 2002).

While the injunction appeal was pending, the commission served discovery requests on the Twins and MLB in connection with the underlying suit. One of the commission's requests sought information on financial relationships between the Twins, or the owner of the Twins, and any other owners of MLB franchises. The Twins and MLB objected to most of the discovery requests and initially produced no documents or substantive information, which resulted in the commission bringing a motion to compel discovery. The district court granted the commission's motion and ordered the Twins and MLB to provide the information and documents requested.

After the district court's order compelling discovery and before any information or documents had been produced, the parties stipulated to a protective order, which the court approved. The Twins then provided the commission with access to approximately 20,000 pages of documents, and, later, provided the commission with a CD–ROM containing images of approximately 9,000 pages of documents. MLB did not produce any documents or information to the commission.[3] Additionally, unidentified parties Jane Roe and John Does 1–5 filed a redacted affidavit and memorandum of law with the district court, with an unredacted version filed under seal, objecting to the commission's discovery requests. They objected to the court's order compelling the Twins to disclose their personal financial information, which was not held by the Twins, but was held by other entities owned by the Pohlad family.[4]

After the Twins provided the commission with the CD–ROM, appellants Star Tribune, Associated Press, and KARE–11 (media) moved to intervene and to modify the court's protective order.[5] The stated purpose of the media's motion was to assert and protect their right and the public's right to have access to court documents and documents produced in the course of litigation. The media also sent letters to the commission requesting access under Minn.Stat. §§ 13.01–.90 (2002), the Minnesota Government Data Practices Act (MGDPA), to all data received by the commission in connection with the lawsuit against the Twins and MLB. When the

---

**3.** The commission brought a second motion to compel discovery, alleging that the Twins had failed to produce all relevant information and documents and that MLB had not produced any information or documents, in violation of the district court's order. But the court never ruled on the commission's motion because the parties settled and the discovery disputes became moot.

**4.** Jane Roe and John Does 1–5 alleged that a discovery request to the Twins was the improper method of obtaining their financial information, which was held by other entities owned by the Pohlad family. Roe and Does 1–5 claimed that the commission was required to follow the procedures set forth in Minn.Stat. §§ 13A.01–.04 (2002) and that the information should have been requested by subpoena, which would have given Roe and Does 1–5 the opportunity to object and be heard.

**5.** The Star Tribune, Associated Press, and KARE–11 were later joined by Northwest Publications, Inc., the owner of the St. Paul Pioneer Press.

commission did not provide access to the data as requested by the media, the media sued the commission for violating the MGDPA.

On June 7, 2002, the district court approved a stipulation between the parties to dismiss the commission's lawsuit. Under the settlement agreement, the Twins and MLB agreed not to eliminate or relocate the Twins for the 2002 or 2003 season. Shortly after the case was settled, pursuant to the district court's protective order, the Twins demanded the return of all confidential documents provided to the commission. Because the commission felt that the terms of the protective order, mandating return of the Twins' documents, and the provisions of the MGDPA were in conflict, the commission brought a motion seeking guidance from the court as to how to dispose of the confidential data. On July 10, 2002, the district court issued an order denying the media's motion to intervene and to modify the parties' protective order and denying the media's motion for access to confidential data, including the sealed unredacted affidavit and memorandum filed by Jane Roe and John Does 1–5. The court also ordered the commission to return or destroy all confidential data of the Twins in its possession pursuant to the court's protective order. On July 26, 2002, the district court granted the media's motion for a stay of the court's July 10, 2002 order pending this appeal and ordered the commission to retain the confidential documents. This appeal follows.

## ISSUES

I. Did the district court abuse its discretion by entering the protective order?

II. Did the district court err in denying the media access to the CD–ROM that was in the possession of the commission and the unredact-ed affidavit and memorandum of law of Jane Roe and John Does 1–5 that were filed under seal with the district court?

III. Did the district court err by denying the media's motion to intervene to modify the court's protective order?

## ANALYSIS

### I.

■■■ The media argue that the district court abused its discretion in entering the protective order. The Minnesota Rules of Civil Procedure give the district court broad discretion to fashion protective orders. *Erickson v. MacArthur*, 414 N.W.2d 406, 409 (Minn.1987). "Absent a clear abuse of discretion, a trial court's decision regarding discovery will not be disturbed." *Id.* at 407 (citation omitted). Minn. R. Civ. P. 26.03 states:

Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

\* \* \* \*

(g) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]

■■■ Generally, the burden of demonstrating good cause rests with the party seeking a protective order. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786–87 (3d Cir.1994) (applying Fed.R.Civ.P. 26(c)). But in complex litigation where a

document-by-document review of each document produced would be unfeasible, umbrella protective orders are not uncommon. *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356–57 (11th Cir.1987) (explaining that umbrella protective orders are designed to encourage and simplify the exchange of large numbers of documents). In cases involving large numbers of documents, the court may put into place an umbrella protective order upon a general showing of good cause by the producing party. *Pansy*, 23 F.3d at 787 n. 17. After the documents are produced, an opposing party may indicate which documents, if any, it believes are not entitled to protection, and the burden of demonstrating good cause for each challenged document lies with the party seeking protection.[6] *Id.; Alexander*, 820 F.2d at 356; *see also State ex rel. Humphrey v. Philip Morris, Inc.*, 606 N.W.2d 676, 686 (Minn. App.2000) (stating that "in complex litigation, it is not uncommon to find a blanket or umbrella order protecting documents based on the producing party's good-faith assertion that they are confidential."), *review denied* (Minn. Apr. 25, 2000).

■ The media do not argue that umbrella protective orders are, in and of themselves, improper, but they assert that the district court abused its discretion by not addressing the impact of the protective order on the public and the media's right to obtain information under Minn.Stat. §§ 13.01–.90 (2002), the Minnesota Government Data Practices Act (MGDPA). While district courts have broad discretion in entering protective orders, in exercising that broad discretion in litigation involving government entities, courts must consider the order's effect on the public's right to information under the MGDPA. *See Ford v. City of Huntsville*, 242 F.3d 235, 242 (5th Cir.2001) (holding that the district court abused its discretion by entering a protective order without considering the order's effect on the public's right to information under Texas law); *Pansy*, 23 F.3d at 791 (holding that when a government entity is a party to litigation, no protective order should be entered without consideration of its effect on the disclosure of government records to the public).

In its April 23, 2002 protective order approving the parties' stipulated confidentiality agreement, the district court found that "[t]he Stipulation and Order follows the provisions of the Data Practices Act (the 'Act') as applied to the facts of this case." The court stated that

> [t]o the extent this Stipulation and Protective Order is inconsistent with the provisions of the Act, this Court relies on its broad authority under Minn. R. Civ. P. 26.03 in issuing a protective order appropriate for the specific facts of this case.

The court also stated that the parties would not face liability under the MGDPA for failing to disclose data pursuant to the terms of the protective order.

Here, the district court considered the possibility that its protective order might affect the disclosure of government docu-

---

6. The *Annotated Manual For Complex Litigation* explains that

[w]hen the volume of potentially protected materials is large, an umbrella [discovery] order will expedite production, reduce costs, and avoid the burden on the court of document-by-document adjudication. Umbrella orders provide that all assertedly confidential material disclosed (and appro-

priately identified, usually by stamp) is presumptively protected unless challenged. The orders are made without a particularized showing to support the claim for protection, but such a showing must be made whenever a claim under an order is challenged.

David Herr, *Annotated Manual For Complex Litigation, Third* § 21.432, at 79 (2003).

ments to the public under the MGDPA. But relying on its broad discretion to fashion protective orders, the district court held that, even though the protective order may be inconsistent with the MGDPA, the protective order was appropriate based on the specific facts of this case. The court determined that the need to assure confidentiality outweighed the public's right to obtain documents under the MGDPA. Because the district court properly considered the protective order's effect on the disclosure of documents under the MGDPA and because of the district court's broad discretion in fashioning protective orders, we conclude that the district court was within its discretion in entering the protective order in this matter.

## II.

The media contend that they are entitled to access to the discovery documents that the Twins provided to the commission. The media also argue that they are entitled to have access to the unredacted affidavit and memorandum of law that were filed under seal with the district court by Jane Roe and John Does 1–5.

The district court denied the media's request for access to these documents. The district court held that the media had no right to have access to the documents that were in the possession of the commission because discovery is generally a private process, and the media had no common-law or First Amendment right to have access to private discovery. The district court also held that the media had no right to have access to the documents that were filed under seal with the court because the documents were protected by a protective order, and the media did not present extraordinary circumstances or a compelling need to modify the protective order.

■ The media argue that they are entitled to access to the discovery documents and the unredacted affidavit and memorandum under common law, the First Amendment, and the MGDPA. When determining whether there is a right to access, we focus on the type of documents at issue, and the nature of the parties involved. *See generally* Minn.Stat. § 13.03, subd. 1 (allowing access to certain types of data in the possession of government agencies, but not providing for access to data in the possession of private parties); *Minneapolis Star & Tribune Co. v. Schumacher*, 392 N.W.2d 197, 202–03 (Minn.1986) (stating that there is a common-law and First Amendment right to have access to civil court records); *State ex rel. Mitsubishi Heavy Indus. of Am., Inc. v. Circuit Court*, 233 Wis.2d 1, 605 N.W.2d 868, 877–78 (Wis.2000) (holding that there is no common-law or First Amendment right for the public or press to have access to unfiled pretrial discovery).

### A. Common Law

■ Decisions by a district court regarding access to court documents under common law are governed by an abuse-of-discretion standard. *Minneapolis Star & Tribune Co.*, 392 N.W.2d at 206. In Minnesota, there is a common-law right to inspect and copy civil court records. *Id.* at 202. The common-law right creates a presumption in favor of access. *Id.* But the common-law right of access is not absolute, and access may be denied where the interests favoring the right of access are outweighed by countervailing interests supporting the denial of access. *Id.* at 202–03 (stating that courts have a general supervisory power over their files and records). Only if the interests favoring the denial of access are strong enough to overcome the presumption in favor of access may access be denied. *Id.*

 Generally, private documents generated during discovery that are not filed with the court are not considered "judicial records." *United States v. Anderson,* 799 F.2d 1438, 1441 (11th Cir. 1986) (stating that "documents collected during discovery are not 'judicial records.'"); *State ex rel. Mitsubishi,* 605 N.W.2d at 873 (stating that "[n]either the press nor the public have a common law right to examine discovery materials as they are being generated in the course of pretrial discovery"). The common-law presumption of access generally only extends to documents that have been filed with the court. *State ex rel. Mitsubishi,* 605 N.W.2d at 874. Furthermore, documents that are filed with discovery motions are not subject to the common-law right of access, whereas discovery documents "filed in connection with pretrial motions that require judicial resolution of the merits" of the case are subject to the common-law right. *Chicago Tribune Co. v. Bridgestone/Firestone,* 263 F.3d 1304, 1312 (11th Cir.2001).

### 1. CD–ROM

 The CD–ROM containing 9,000 imaged documents was obtained by the commission from the Twins through the discovery process and was not filed with the court. Because the CD–ROM is pretrial discovery that has not been filed with the court, the media have no common-law right to access. The commission is prevented from providing public access under the MGDPA by the court's protective order, which is discussed above.

### 2. Affidavit and Memorandum

 The unredacted affidavit and memorandum were submitted to the district court under partial seal by nonparties Jane Roe and John Does 1–5. The nonparties submitted these documents to challenge the commission's ability to obtain their personal banking records from the Twins through the discovery process. Because the suit was settled and dismissed, the district court never addressed the nonparties' challenge, finding the nonparties' motion to be moot. Thus, the district court never relied on the information in the affidavit or memorandum to make a decision regarding the merits of the case. We conclude that the district court was within its broad discretion in allowing the documents to be filed with the court under seal to protect the identities and privacy of the nonparties and providing the nonparties with an opportunity to challenge the commission's discovery request. Because the documents were submitted with a discovery motion and filed under seal with the court's specific approval, we conclude that the district court was within its discretion in holding that the nonparties' documents were not subject to the common-law right to access.

### B. First Amendment

 Generally, questions of constitutional access to court documents are subject to de novo review. *In re Providence Journal Co.,* 293 F.3d 1, 10 (1st Cir.2002). Similar to the common-law standard, a presumption of access to judicial records exists under the First Amendment. *Minneapolis Star & Tribune,* 392 N.W.2d at 203. The Minnesota Supreme Court has held that

> [i]n order to overcome the presumption in favor of access, a party must demonstrate that a compelling governmental interest exists and that the restriction on access is narrowly tailored to meet this governmental interest.

*Id.* (citation omitted). To determine whether the constitutional standard applies, a court first looks at the documents in question to determine whether they

have historically been open to the public. *Id.* at 204. If so, the court then examines the constitutional right asserted to determine whether it warrants protection of the documents. *Id.*

In the seminal case of *Seattle Times Co. v. Rhinehart*, the United States Supreme Court stated:

> We therefore hold that where, as in this case, a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment.

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37, 104 S.Ct. 2199, 2209–10, 81 L.Ed.2d 17 (1984). Relying on the United States Supreme Court's decision in *Rhinehart*, the Wisconsin Supreme Court has held that unfiled pretrial discovery documents generated in a civil action are not public records and that no First Amendment right of access extends to such materials. *State ex rel. Mitsubishi*, 605 N.W.2d at 877–78. Furthermore, it has been held that materials that have been submitted to a court in connection with a discovery motion are not subject to the First Amendment right of access. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986) (stating that "there is no presumptive first amendment public right of access to documents submitted to a court in connection with discovery motions").

### 1. CD–ROM

■ The CD–ROM at issue is unfiled pretrial discovery. The protective order entered by the court only protected the documents from disclosure as pretrial discovery and did not restrict the dissemination of the information if it was gained from other sources. Because the CD–ROM is pretrial discovery that has not been filed with the court, the media do not have a First Amendment right to have access to the CD–ROM.

### 2. Affidavit and Memorandum

■ The district court granted the motion of Jane Roe and John Does 1–5 to have their affidavit and memorandum filed under partial seal. The court was within its broad discretion in sealing the documents to protect the privacy of the nonparties pending the outcome of their motion. Because there is generally no First Amendment right to access documents that have been submitted to the court in connection with a discovery motion, the affidavit and memorandum are not subject to the First Amendment right of access.

### C. Data Practices Act

The media argue that they are entitled to access to the CD–ROM under the MGDPA because it is in the possession of a government agency, the commission. The MGDPA provides that

> [a]ll government data collected, created, received, maintained or disseminated by a state agency, * * * shall be public unless classified by statute, * * *, or federal law, as nonpublic or protected nonpublic, or with respect to data on individuals, as private or confidential.

Minn.Stat. § 13.03, subd. 1. Under the MGDPA, people generally have the right to request access to public data in the possession of government agencies, and the government agency has the obligation to provide access to the data. *Id.*, subd. 3.

The media assert that they are entitled to access to the CD–ROM because the CD–ROM became "inactive civil investigative data" when the commission decided not to pursue the case further. The MGDPA states that

> data collected by state agencies * * * as part of an active investigation undertak-

en for the purpose of the commencement or defense of a pending civil legal action, or which are retained in anticipation of a pending civil legal action, are classified as protected nonpublic data * * * in the case of data not on individuals and confidential data * * * in the case of data on individuals.

Minn.Stat. § 13.39, subd. 2(a). In addition, the MGDPA states:

Inactive civil investigative data are public, unless the release of the data would jeopardize another pending civil legal action, and except for those portions of a civil investigative file that are classified as not public data by this chapter or other law. * * * Civil investigative data become inactive upon the occurrence of any of the following events:

(1) a decision by the state agency * * * not to pursue the civil action[.]

*Id.,* subd. 3.

■■■ The legislature's principal purpose in adopting Minn.Stat. § 13.39 was to prevent government agencies from being at a continual disadvantage in litigation by having to prematurely disclose their investigative work product to opposing parties or the public. Op Att'y Gen. 852 (Aug. 4, 2000); Margaret Westin, *The Minnesota Government Data Practices Act: A Practitioner's Guide and Observations on Access to Government Information,* 22 Wm. Mitchell L.Rev. 839, 864 n. 156 (1996). In line with the principal legislative purpose of Minn.Stat. § 13.39, Minnesota courts have held that civil investigative data do not include:

● a teacher's personnel data, *Navarre v. S. Washington County Sch.,* 652 N.W.2d 9, 29 (Minn.2002) (holding that personnel data collected by a school district were not civil investigative data because "there was no evidence that * * * the data * * * [were] part of an active investigation un-

dertaken for the purpose of commencing or defending a pending civil legal action.");

● a notice-of-claim letter, *St. Peter Herald v. City of St. Peter,* 496 N.W.2d 812, 814 (Minn.1993) (holding that a notice of claim received by city was not civil investigative data because the data were not collected as part of an active investigation); or

● settlement documents, *Everest Dev., Ltd. v. City of Roseville,* 566 N.W.2d 341, 344 (Minn.App.1997) (holding that settlement documents were not civil investigative data because "they were not created for the commencement or defense of a 'pending civil legal action,' but rather for the settlement of a lawsuit.").

### 1. CD–ROM

■■■ Our first inquiry is whether the CD–ROM constituted civil investigative data. The commission did not obtain the CD–ROM as part of an active investigation for the purpose of the commencement of a pending civil legal action, nor did it retain the CD–ROM in anticipation of a pending civil action. The commission obtained the CD–ROM through discovery after it commenced this civil action against the Twins and MLB. Thus, the CD–ROM was not collected for the purpose of the commencement or in anticipation of a pending civil action because the civil action had already commenced. Additionally, treating documents received through discovery as civil investigative data would not serve the principal statutory purpose of Minn.Stat. § 13.39, which is to prevent government agencies from being disadvantaged in litigation by having to prematurely disclose their investigative work product to opposing parties and the public. We, therefore, conclude that the CD–ROM never became civil investigative data. Because the CD–ROM was never civil investigative data, it never became inactive civil investigative

data. As a result, the media are not entitled to access to the CD–ROM under the MGDPA.

 Even if the CD–ROM was public inactive civil investigative data under Minn.Stat. § 13.39, the media would not be entitled to access to the CD–ROM pursuant to Minn.Stat. § 13.393. Under Minn.Stat. § 13.393, government agencies are subject to court rules regarding discovery. The statute states:

> Notwithstanding the provisions of this chapter and section 15.17, the use, collection, storage, and dissemination of data by an attorney acting in a professional capacity for the state, a state agency or a political subdivision shall be governed by statutes, rules, and professional standards concerning discovery
> * * *.

Minn.Stat. § 13.393. Under this statute, a protective order that prevents a government agency from providing access to data in its possession governs the public's right to have access to the data under the MGDPA.

Here, the district court entered a protective order pursuant to Minn. R. Civ. P. 26.03. Under Minn.Stat. § 13.393, the court's protective order governs the media's right to access under the MGDPA. Thus, because we determined that the district court was within its discretion in entering the protective order, we conclude that the media do not have a right to have access to the CD–ROM under the MGDPA.

### III.

 The media argue that the district court erred by denying their motion to intervene as a matter of right to seek modification of the court's protective order. This court independently assesses the appropriateness of orders denying intervention as a matter of right. *Norman*

*v. Refsland,* 383 N.W.2d 673, 676 (Minn. 1986). Intervention as of right shall be allowed under Minn. R. Civ. P. 24.01 when an applicant for intervention meets the following four criteria:

> (1) [A] timely application for intervention; (2) an interest relating to the property or transaction which is the subject of the action; (3) circumstances demonstrating that the disposition of the action may as a practical matter impair or impede the party's ability to protect that interest; and (4) a showing that the party is not adequately represented by the existing parties.

*Minneapolis Star & Tribune,* 392 N.W.2d at 207 (citations omitted); *see also* Minn. R. Civ. P. 24.01. The Minnesota Supreme Court has stated that it is appropriate for a media representative or other interested nonparty to make a motion to intervene as a matter of right under Minn. R. Civ. P. 24.01 when challenging a trial court's order sealing a file. *Minneapolis Star & Tribune,* 392 N.W.2d at 207.

The media assert a legally protected interest in the disputed documents in this case based on the common law, the First Amendment, and the MGDPA. As discussed above, the media do not have a right to have access to the CD–ROM or the sealed documents. Therefore, the media do not have an interest relating to the property involved in this action, and the district court properly denied their motion to intervene. Because we conclude that the media do not have an interest relating to the property in this action, we need not reach the issues of timeliness, appellants' ability to protect their interest, or the adequacy of representation by the existing parties.

### DECISION

The district court was within its discretion in entering the protective order and

did not err by denying the media's motion to have access to discovery documents and sealed pleadings and by denying the media's motion to intervene.

**Affirmed.**